# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 10-CV-3923 (JFB)
_____

ROBERT J. DORN,

Plaintiff,

VERSUS

MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY,

Defendant.

_____

**MEMORANDUM AND ORDER**
March 19, 2012
_____

JOSEPH F. BIANCO, District Judge:

Robert J. Dorn (the "plaintiff" or "Dorn") commenced this action, pursuant to the Social Security Act, 42 U.S.C. § 405(g), challenging the decision of the defendant, the Commissioner of the Social Security Administration (the "Commissioner"), that affirmed the Social Security Administration's (the "SSA") partially favorable decision that found that plaintiff was disabled as of June 5, 2007.

The Commissioner has moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and argues that the Commissioner's decision was supported by substantial evidence and was based on the application of correct legal standards. The plaintiff has cross-moved for judgment on the pleadings and argues that the Administrative Law Judge failed to fulfill his duty to develop the record and, in any event, the decision was barred by the doctrine of res judicata. Plaintiff challenges only the portion of the decision that finds that plaintiff was not disabled before June 5, 2007. In the alternative, plaintiff asks this Court to remand pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, the case is remanded to the ALJ for further proceedings consistent with this Memorandum and Order.

## I. BACKGROUND

### A. Facts

Plaintiff was born in 1969 and has a high-school education. (AR[1] 127, 141.) Dorn was diagnosed as HIV-positive on

---

[1] "AR" refers to the administrative record filed on appeal.

January 21, 1992, and was diagnosed with AIDS in 1998. (AR 229.) From 1985 to 1999, plaintiff worked as a manager at Burger King. (AR 137.) In order to perform his job duties, plaintiff walked and stood for approximately ten hours a day for five days per week. (AR 137.) Plaintiff attempted to return to work in September 2000, but had to stop work after only a month due to his medical impairments. (AR 167.) From February 2003 to September 2004, plaintiff was incarcerated. (AR 167.) According to a Disability Report, plaintiff returned to work as a fast-food manager on September 24, 2004, but had to stop work on October 24, 2004 because he was in "too much pain." (AR 136.) Plaintiff was incarcerated a second time from May 21, 2005 to April 24, 2007. (AR 142, 156.) In May 2007, plaintiff attempted to return to work at Burger King, but after six weeks he had to resign due to his medical impairments. (AR 167.)

### 1. Plaintiff's Medical History Prior to His Incarceration From May 21, 2005 To April 24, 2007

Plaintiff began treatment at the Nassau County Medical Center in December 1999 and his treatment notes indicate that he missed and rescheduled appointments. (AR 202-29.) Medical notes by Dr. Getachew Feleke indicate that, in July 2000, plaintiff felt "well" and had a good appetite. (AR 203.) According to medical notes dated September 8, 2000, plaintiff's main complaint at that time was occasional itching from psoriatic lesions. (AR 204-05.) Dr. Feleke noted that plaintiff had no complaints and that he weighed 130 pounds. (AR 205.) Dr. Feleke diagnosed plaintiff with HIV, psoriasis and "noncompliance." (AR 205.) Dr. Feleke continued a treatment of Crixivan, Combivir, and Lidex. (AR 204.) Testing was conducted on September

18, 2000, and showed a combined CD3 and CD4 count of 422, a viral load of 350,950, and a T-helper-cell-to-suppressor-cell ratio of 0.23. (AR 208-09.) Plaintiff's suppressor T cells were "markedly increased." (AR 208.) Testing was done on October 15, 2001, and showed plaintiff's viral load reduced to 107,706, and a combined CD3 and CD4 count of 295. (AR 214-15.)

Plaintiff went to St. Lukes-Roosevelt Hospital Clinic ("St. Lukes") on July 9, 2002. (AR 175-76.) According to nurse practitioner Susan Heffron's ("Heffron") notes, plaintiff was "feeling well" and offered no complaints. (AR 175.) On examination, plaintiff had "scattered erythematous lesions and scaling." (AR 176.) When plaintiff returned for a follow-up on July 30, 2002, Heffron's notes indicate that plaintiff was "feeling well, offers no complaints" and "denies any cough, fever, NS, N+V diarrhea." (AR 177.) His test results showed that he had a CD4 count of 221, and a viral load of greater than 75,000 (AR 177.) Heffron's notes also indicate that her impression of plaintiff was "HIV- less than optimal response on meds, however will have pt continue X 4 weeks and recheck for two readings, reviewed med instructions with pt." (AR 177.)

### 2. Plaintiff's Medical History After His Incarceration From May 21, 2005 To April 24, 2007

Plaintiff did not return to St Lukes until May 17, 2007. (AR 179-83.)[2] He reported no illness while incarcerated and that his most recent CD4 count taken in March 2007 had been 163, and his viral load had been 100,093. (AR 179.) Plaintiff also reported that he had been off his antiretroviral

---

[2] There are no medical records in the administrative record filed on appeal between July 20, 2002 and May 17, 2007.

medication and that he stopped substance abuse in 2004. (AR 179.) The medical notes also indicate that plaintiff "denies any cough, fevers, NS, no N+V or diarrhea." (AR 179.) On physical examination, plaintiff ambulated without difficulty, had a few annular erythematous patches and scaling, and no open lesions. (AR 181.) His HIV was assessed as "clinically stable" and his body mass index of 26, based on a weight of 187 pounds, was too high. (AR 183, 181.) A mental health screening was "unremarkable" although a mental-health referral had been made by his primary care physician, which plaintiff refused. (AR 183.)

Plaintiff's next visit to St. Lukes was on June 5, 2007. (AR 184-86.) He weighed 180 pounds and was assessed as "clinically stable." (AR 184-186.) Plaintiff was upset because he had lost weight in the last week, had no appetite, and was "very fearful of becoming wasted." (AR 184.) The report from plaintiff's visit noted that he "needs arvs and pt insists that he will only take Cricivan and Combivir that worked for him while incarcerated." (AR 186.) Heffron discussed the toxicities of these medications, but plaintiff refused any other medication regimen. (AR 186.) Plaintiff was referred to a nutritionist. (AR 186.)

Plaintiff was evaluated by consultative examiner Dr. Jerome Caiati on July 11, 2007. (AR 187-90.) Plaintiff reported being able to cook, clean, do laundry, go shopping and take care of his personal hygiene. (AR 187.) He weighed 166 pounds. (AR 187.) He was able to squat halfway, but with pain in both knees. (AR 188.) He had a normal gait and stance, and could walk on his heels and toes with minimal difficulty without the use of an assistive device. (AR 188.) His skin examination was within normal limits and plaintiff had a full range of motion in his cervical, thoracic and lumber spines. (AR 188.) He had a full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles, and full strength in both upper and lower extremities. (AR 189.) His hand and finger dexterity were intact and his grip strength was full. (AR 189.) X-rays were taken of plaintiff's right knee and showed narrowing of the medical femorotibial joint space, spurring in the tibial spines, some spurring in the patellofemoral joint, and a loose body. (AR 191.) Dr. Caiati diagnosed plaintiff with HIV-positive status, hypertension, a history of drug and alcohol abuse, and "bilateral knee spontaneous dislocations with no full workup for etiology." (AR 191.)

On August 20, 2008, plaintiff had blood testing performed at Nassau University Medical Center where it was determined that that his viral load was measured at 126,056, his combined CD3 and CD4 count was 316, and his T-helper-cell-to-suppressor-cell ratio was 0.17. (AR 217-18.) Plaintiff saw Dr. Natalija Ovsjanikovska at Nassau University Medical Center on September 4, 2008 and she prescribed Zoviraxfor for herpres-related sores, Oxandrolone, an anabolic steroid designed to cause weight gain, and continued plaintiff's Crixivan and Combivir. (AR 224.) Dr. Ovsjanikovska assessed plaintiff's adherence to treatment as "60%" and described him as "non-adherent" but now wanting to take medications properly. (AR 224.) She also noted that plaintiff wanted to gain weight and advised him on a lifestyle change and diet. (AR 224.) In Dr. Ovsjanikoska's evaluation form, which evaluated plaintiff's ability to perform work-related activities, she noted that plaintiff could sit for 2 hours without interruption, for a total of 4 hours in an 8-hour workday, and stand and/or walk for a total of 2 hours per workday, but could do no lifting or carrying. (AR 222.)

On December 15, 2007, plaintiff saw Dr. David Nelson, an ophthalmologist, and reported having difficulty driving due to sun glare and rain at night. (AR 225.) His visual acuity was measured at 20/400 in his right eye and 20/60 in his left eye. (AR 225.)

On February 9, 2009, Dr. Ovsjanikovska completed a second evaluation of plaintiff's work-related activities and diagnosed HIV-positive status, hypertension, recurrent herpes, simple virus infection, and wasting syndrome. (AR 228.) She noted that plaintiff weighed 127.5 pounds as of January 2009, and had severe muscle weakness, night sweats, and difficulty ambulating for prolonged periods of time. (AR 228.) She again noted that plaintiff could sit for 2 hours without interruption, for a total of 4 hours in an 8-hour workday, and stand and/or walk for a total of 2 hours per workday, but could do no lifting or carrying. (AR 222.)

In a letter dated March 23, 2009, Dr. Munou Absy of the Nassau University Medical Center stated that plaintiff had been HIV-positive since January 1992, diagnosed with AIDS since 1998, and stated that as of August 20, 2008, his CD4 count was 316 and his HIV viral load was 126,050. (AR 229.) Dr. Absy noted that plaintiff had not worked from September 14, 2004 through March 2007 "due to medical disability" and was unable to return to work since then "due to weakness, diarrhea and fatigue," conditions which were complications from AIDS. (AR 229.)

### 3. Plaintiff's Applications for Disability and Supplemental Security Income

Plaintiff filed an application for disability insurance and Supplemental Security Income ("SSI") benefits on May 3, 2007 and alleged that he had been disabled since April 1, 1999. (AR 105-13.) On July 18, 2007, his applications were denied. (AR 53-60.) Plaintiff requested an administrative hearing which was held on March 18, 2009, before Administrative Law Judge ("ALJ") Crawley. (AR 61.)

Plaintiff testified at the hearing that he had weighed 187 pounds when he was released from prison in 2007, but at the time of the hearing his weight was down to 133 pounds. (AR 24.) He also testified that he had been diagnosed with wasting syndrome while in prison. (AR 24.) In addition, plaintiff testified that he had been sober for four years as of the date of the hearing. (AR 25.) Plaintiff also testified that he tried to return to work a third time in February 2007 to a new managerial position with the company "On the Run," but he only "lasted like two and a half months again" before he had to stop working. (AR 26-27.) Plaintiff attempted to go back to work again in February 2008 and lasted two and one-half months. (AR 26-27.) Plaintiff also testified about his symptoms as of the time of the hearing. (AR 32-39.) Plaintiff woke up throughout the night with night sweats and bad bowel movements. (AR 32.) His medications made him tired, drained, and caused headaches and he spent most of his days lying on a sofa watching television. (AR 32-33.) Plaintiff's brother-in-law took him to most of his doctor's appointments. (AR 34.) Plaintiff was unable to help out with household chores but occasionally was able to help. (AR 35-36.) Plaintiff reported that he experienced flu-like symptoms, including nausea, vomiting and fatigue. (AR 33, 37.) In addition to the HIV wasting syndrome symptoms, both of plaintiff's knees were giving him trouble. (AR 30.) He testified that he was able to sit for approximately one and one-half hours at a

time and could stand in place for about 10 minutes or could walk about half a block before becoming too tired to continue. (AR 42-43.)

Prior to the date of the hearing, plaintiff's prior counsel, Linda Markowsky, Esq., submitted a pre-hearing memorandum to the ALJ dated February 16, 2009 which, *inter alia*, acknowledged a gap in plaintiff's medical record during plaintiff's period of incarceration. (AR 168.) At the hearing, the following exchange took place between the ALJ, Markowsky and plaintiff regarding the gap in the medical records:

ALJ: No, but I mean, is there anything else? I mean, because we do have a, I understand that there was a period of incarceration.

ATTY: Yeah. I haven't tried to get those records. Would you want to see them?

ALJ: Well, you know, the thing is I don't really know if you, if you look at some of the records immediately when he was released, –

ATTY: Right.

ALJ: – it seems like it says that, you know, he was doing pretty good.

ATTY: Yeah

ALJ: Once, when he was, when he was in the facility, but obviously, the condition has taken a turn for the worse so –

Atty: Correct.

ALJ: So you know, I don't tell lawyers how to –

ATTY: Right.

ALJ: – represent their clients, –

ATTY: – but, you know, I mean, it doesn't really seem that that would really do a heck of a lot for this particular case, buy you know, if you think it's necessary, I would certainly –

CLMT[3]: Can I say something, Your Honor, for a second?

ALJ: Sure.

CLMT: When you're in the facility, –

ALJ: Um-hum.

CLMT: – not too many people know this, when I was in that facility for that short period of time, they're always running their air conditioning, so it's killing germs. And when I was in that facility, I was feeling pretty good from time to time.

ALJ: Um-hum.

CLMT: But when you're out of that facility, this sounds crazy, but when you're out and back into society, you can end up touching more things and being around different things and being exposed to different things.

ALJ: So you've got some – okay.

CLMT: I was like, I really came together about a month after the fact

---

[3] The transcript from the hearing before the ALJ refers to plaintiff as "CLMT."

that I did get released when things started happening to me right away. And I went very upset to my, my new doctor and I said, I don't know what's going on here. And then she even, you know, she even explained to me, she said, you're around an area where there was nothing around where it was like germ free because when you're in cold air all the time and there's air constantly blowing, and they had that in the facility, that kills the germs on a lot of things.

ALJ:  Well, you know, I'm not so interested in the theories of why.

CLMT: No, but I found out.

ALJ: Yeah, yeah.

CLMT:  Yeah, because I was concerned about it because it was strange, what was going on with me.

ALJ:  I'm more interested in the, in the practice effects of –

ATTY:  Right.

ALJ:  – things than theoretically why you're better or worse.  I'm more interested in just what's going on with you . . .

(AR. 48-50.)  On April 2, 2009, the ALJ issued a partially favorable decision and found that plaintiff was disabled as of June 5, 2007, but not before.  (AR. 4-17.)  The ALJ stated that:

Prior to June 5, 2007, the date claimant became disabled, the claimant had the following medically determinable impairment:  HIV. However, this impairment did not

cause more than a minimal impact on the claimant's ability to perform basic work activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR [§§] 404.1521 and 416.921).

(AR 12.)  Moreover, the ALJ stated that "[t]he claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible prior to June 5, 2007, to the extent they are inconsistent with findings that the claimant has no severe impairment or combination of impairments.  .  .  ."  The ALJ then summarized plaintiff's medical history prior to June 5, 2007 and stated that "[i]n sum, the conclusion that prior to June 5, 2007, the claimant has not had an impairment or combination of impairments that significantly limits his ability to perform basic work activities is supported by the Nassau University Medical Center Records and St Lukes-Roosevelt Hospital records."  (AR 14.)   On June 29, 2010, the Appeals Council denied plaintiff's request for review.  (AR 1-3, 18-19.)

B.  Procedural History

On August 26, 2010, plaintiff filed the complaint in this action and a motion for leave to proceed *in forma pauperis*.  On August 26, 2010, this Court granted plaintiff's application for leave to proceed *in forma pauperis*.  The Commissioner filed his motion for judgment on the pleadings on January 27, 2011.   Plaintiff filed his opposition and cross-motion for judgment on the pleadings on February 28, 2011.  The Commissioner filed a reply in further support of the motion for judgment on the pleadings and in opposition to plaintiff's cross-motion on April 18, 2011.  The

plaintiff filed a sur-reply memorandum in opposition to defendant's motion for judgment on the pleadings and in further support of plaintiff's cross-motion on May 6, 2011. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

A district court may only set aside a determination by an ALJ that is "based upon legal error" or "not supported by substantial evidence." *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998) (citing *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam)). The Supreme Court has defined "substantial evidence" in Social Security cases as "more than a mere scintilla" and that which "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Quinones v. Chater*, 117 F.3d 29, 33 (2d Cir. 1997) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (internal quotations and citations omitted)). Furthermore, "it is up to the agency, and not th[e] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). If the court finds that there is substantial evidence to support the Commissioner's determination, the decision must be upheld, even if there is substantial evidence for the plaintiff's position. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991). "Where an administrative decision rests on adequate findings sustained by evidence having rational probative force, the court should not substitute its judgment for that of the Commissioner." *Yancey*, 145 F.3d at 111; *see also Jones*, 949 F.2d at 59 (quoting *Valente v. Sec'y of Health &*

*Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

In order to obtain a remand based on additional evidence, a plaintiff must present new evidence that: "(1) is 'new' and not merely cumulative of what is already in the record[;]" (2) is material, in that it is "relevant to the claimant's condition during the time period for which benefits were denied," probative, and presents a reasonable possibility that the additional evidence would have resulted in a different determination by the Commissioner; and (3) was not presented earlier due to good cause. *Lisa v. Sec'y of the Dep't of Health & Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991). Similarly, as discussed below, a reward is warranted if the ALJ failed to develop the record. *See Moran v. Astrue*, 569 F.3d 108, 114-15 (2d Cir. 2009).

## III. STANDARD FOR ENTITLEMENT TO DISABILITY BENEFITS

A claimant is entitled to disability benefits under the SSA if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual's physical or mental impairment is not disabling under the SSA unless it is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations establishing a five-step procedure for evaluating disability claims. *See* 20 C.F.R §§ 404.1520, 416.920. The

Second Circuit has summarized this procedure as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citing *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)). The claimant bears the burden of proof with regard to the first four steps; the Commissioner bears the burden of proving the last step. *Brown*, 174 F.3d at 62.

The Commissioner "must consider" the following in determining a claimant's entitlement to benefits: "(1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).

## IV. DISCUSSION

### A. Development of the Record

Plaintiff argues that the ALJ failed to develop the record. Specifically, plaintiff argues that the ALJ failed to obtain plaintiff's medical records during his period of incarceration immediately prior to his application for benefits.[4] For the reasons set forth below, after a thorough and careful examination of the administrative record in this case under the deferential standard applicable to Social Security appeals, the Court concludes that the ALJ failed to fully develop the record in accordance with the applicable regulations. Specifically, the ALJ failed to request plaintiff's medical records for the 12 months prior to his application

---

[4] In addition to arguing that the record is not complete because there was a gap in the medical records during the 12-month period immediately preceding the plaintiff's application for benefits, plaintiff points to the following gaps in plaintiff's medical records: December 26, 2000 through October 20, 2001, October 22, 2001 through July 9, 2002, August 1, 2002 through May 16, 2007, and May 28, 2007 through August 17, 2008. (Pl.'s Br. at 11.) However, plaintiff's brief states that:

> The plaintiff acknowledges the ALJ's ruling which states his prior application would not be reopened and reconsidered because the current application was not filed within the appropriate time limit. (Transcript at 9). However, as will be discussed *infra* the appropriate look back period actually commences in 2006, not 1999. The gaps in the medical record prior to 2006 are being discussed to fully demonstrate the glaring errors made below.

(Pl.'s Br. at n.5.) Thus, although plaintiff's brief details at length the gaps in plaintiff's medical record before 2006, those gaps are not relevant to the case at bar.

and, accordingly, the case must be remanded for further proceedings.

It is well-established that the ALJ must "'[a]ffirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). The ALJ's regulatory obligation to develop the administrative record exists even when the claimant is represented by counsel or by a paralegal at the hearing. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Pratts*, 94 F.3d at 37.The regulations provide that

> (d) Our responsibility [b]efore we make a determination that you are not disabled, we will develop your complete medical history for at least 12 months preceding the month in which you file your application [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.
>
> > (1) "Every reasonable effort" means that we will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one follow[-]up request to obtain the medical evidence necessary to make a determination. The medical source will have a minimum of 10 calendar days from the date of our follow[-]up request to reply, unless our experience with that source indicates that a longer period is advisable in a particular case.

20 C.F.R. § 404.1512(d)-(d)(1). "Complete medical history" is defined as "[t]he records of your medical source(s) covering at least the 12 months preceding the month in which you file your application. . . ." 20 C.F.R. § 404.1512(d)(2). "Medical sources refers to acceptable medical sources, or other health care providers who are not acceptable medical sources." 20 C.F.R. § 404.1502. An "acceptable medical source refers to one of the sources described in [20 C.F.R. §] 404.1513(a) who provides evidence about your impairments. It includes treating sources, nontreating sources, and nonexamining sources." *Id.* The sources described in 20 C.F.R. § 404.1513(a) are: (1) licensed physicians; (2) licensed or certified psychologists; (3) licensed optometrists, (4) licensed podiatrists; and (5) qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

Here, Dorn filed his application for benefits on May 3, 2007, and alleged that his disability began April 1, 1999. (AR 9, 105-106.) Thus the 12-month period preceding the date of the application would be May 3, 2006 through May 2, 2007. The Commissioner acknowledges that the plaintiff's medical records for the 12 months immediately preceding plaintiff's application for benefits were not considered by the ALJ. (Def.'s Br. at 4-6.) In addition, this gap was acknowledged by the attorney who represented plaintiff before the ALJ, as well as by the ALJ, during the hearing. (AR 48.)

The Commissioner attempts to argue that the ALJ's colloquy with the plaintiff's counsel and plaintiff during the hearing was sufficient to meet the ALJ's burden to develop the record. (Def.'s Reply at 5.) However, this Court disagrees. First, there

is no evidence that the ALJ requested the medical records from a "medical source" as required. Moreover, the ALJ's exchange with plaintiff's counsel was clearly not a request for the plaintiff's medical records during his period of incarceration. In fact, it was plaintiff's counsel that asked the ALJ if he wanted the records and the ALJ's response was "[w]ell, you know, the thing is I don't really know if you, if you look at some of the records immediately when he was released, –." (AR 48.) Thus, not only did the ALJ fail to request the necessary medical records, when asked if he would like counsel to obtain the records he essentially indicated that he did not think they were necessary. Accordingly, the ALJ failed to establish the record as required. *See, e.g*, *Eiden v. Sec'y of Health, Ed. and Welfare,* 616 F.2d 63, 64 (2d Cir. 1980) (remanding to require ALJ to gather evidence to determine whether plaintiff was disabled prior to expiration of coverage); *Caputo v. Astrue*, No. 07-CV-3992 (DLI)(JO), 2010 WL 3924676, at *6 (E.D.N.Y. Sept. 29, 2010) ("Accordingly, the court remands and directs the ALJ to develop the record to determine whether plaintiff was disabled before January 22, 1981."); *Walker v. Heckler*, 588 F. Supp. 819 (S.D.N.Y. 1984) (remanding to gather additional evidence as to onset date of tumor).

The Commissioner attempts to analogize this case to other cases within this circuit where courts have held that the ALJ had sufficiently developed the record notwithstanding the absence of certain medical information. However, these cases are distinguishable from the instant case. First, the Commissioner cites to *DeChirico v. Callahan*, where the Second Circuit held that the ALJ did not abuse his discretion in failing to subpoena the claimant's prior disability file. 134 F.3d 1177, 1184 (2d Cir.

1998). However, although the Commissioner is correct that the Court noted that plaintiff was represented by counsel and that his counsel failed to indicate how the file would be relevant, the file at issue was ten years old. *Id*. Moreover, an ALJ may not need a prior claim file when at least four years have elapsed between the date of the prior notice of the initial determination and the date of the new application. *Id*. at 1183-84 (internal citations omitted). Accordingly, in *DeChirico*, obtaining the ten year old prior claim file was discretionary and it was found not to be an error when the ALJ did not subpoena the file. This case, however, is distinguishable from the case at bar.

Moreover, the Commissioner's reliance on *Snitzer v. Astrue*, No. 09-CV-2705 (CBA), 2011 WL 1322274 (E.D.N.Y Mar. 31, 2011), is also unavailing. In *Snitzer*, although a medical opinion from one of the plaintiff's treating physicians was absent from the record, the ALJ fulfilled his obligation to develop the record by: (1) conducting a pre-hearing conference with Snitzer to determine what records the ALJ might need and where the records were located, (2) serving a subpoena on the necessary entity, (3) holding the administrative hearing open so that Snitzer's attorney could provide a medical opinion of the plaintiff's physician, and (4) after the Appeals Council remanded the case, the ALJ again served a subpoena on N.Y.U. and directed the subpoena to a particular doctor. *Id.*, at *8. There is no evidence in the record in this case that the ALJ attempted to subpoena plaintiff's medical records from his place of incarceration or that he held the record open after the administrative hearing for the inclusion of those records. Accordingly, the Commissioner's reliance on *Snitzer* is misplaced.

The Commissioner also cites to the Eastern District of New York case *Chuckman v. Apfel*, No. 98-CV-3900 (JG), 1999 WL 890902 (E.D.N.Y. Sept. 24, 1999), for support for his position that the ALJ did not fail to fulfill his duty to develop the record. In *Chuckman*, the plaintiff alleged that the ALJ failed to consider the side effects of his medications. *Id* at *4. The Court noted that "[w]hile the ALJ had a statutory duty to develop the record fully, it was not an abuse of discretion for her to fail to *sua sponte* delve into the issue of pharmaceutical side effects when neither Chuckman nor his counsel had given any indication that such side effects were disabling or would prevent him from performing past relevant work." *Id*. at *6 (citing *DeChirico*, 134 F.3d at 1184.) However, unlike the case at bar, the ALJ in *Chuckman* had available the medical records from plaintiff's treating medical providers during the 12-month period prior to the application for benefits. Thus, the case is not analogous to the case at bar.

Although it is unclear what impact, if any, the medical records for the 12-month period preceding plaintiff's application for benefits will have to the determination of his disability onset date, this Court finds that the ALJ failed to fully develop the record and the case should be remanded.

### B. Res Judicata

Plaintiff argues that the Commissioner's decision is barred by the doctrine of res judicata and points to a Disability Report dated May 3, 2007 that indicates that plaintiff was found disabled as of March 14, 2006. (AR 128, 132.) Thus, according to plaintiff, the disability determination that should have been made was whether Dorn's disability continued throughout his incarceration, and whether any improvement

in his medical condition related to his ability to work. (Pl.'s Br. at 14.) Plaintiff also argues that the defendant had an obligation to request the prior case folder and failed to do so. (Pl.'s Sur-Reply at 6 (citing Program Operations Manual System ("POMS") 20505.010.C).) The Commissioner argues that there is no record of any hearing and that this indication in the Disability Report must be a computer system error. (Def.'s Reply at 6.) In support of this argument defendant notes that there would have been no reason for plaintiff to file for benefits on May 3, 2007, if he had already received a favorable decision on March 14, 2006. (*Id*. at 7.) Moreover, the defendant argues that, because there was no prior hearing, there was no need to request the file. (*Id*. at 7.)

To the extent that plaintiff seeks to invoke res judicata based simply on the entry on the Disability Report, the Court rejects that contention at this juncture, and judgment on the pleadings in plaintiff's favor on that issue is unwarranted. It is entirely unclear whether or not a hearing actually was conducted, and whether plaintiff was in fact found to be disabled as of March 14, 2006. Apart from the Disability Report, there are no documents in the record that indicate that a hearing took place and that plaintiff was found to be disabled as of March 14, 2006. Accordingly, the Court cannot determine the preclusive effect of any such decision and is remanding this case with an instruction for the ALJ to fully explore his eligibility history, including an examination of any prior case folder.

### V. Conclusion

For the reasons set forth above, the cross-motions for judgment on the pleadings are denied, but the plaintiff's motion for remand is granted. The case is remanded to

the ALJ for further proceedings consistent with this Memorandum and Order. Specifically, on remand, the ALJ must request the plaintiff's medical records for the 12 months prior to his application. Moreover, the ALJ must fully explore plaintiff's eligibility history, including an examination of any prior case folder relating to an alleged disability hearing that found plaintiff disabled as of March 14, 2006.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:       March 19, 2012
             Central Islip, NY

* * *

Plaintiff is represented by Darleen Rosch, Esq. of Nassau/Suffolk Law Services Committee, Inc., 1757 Veterans Highway, Suite 50, Islandia, NY 11749. Defendant is represented by Arthur Swerdloff, Esq., of the United States Attorneys' Office, 271 Cadman Plaza East, 7th Floor, Brooklyn, NY 11201.